IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION  AT  DAYTON

SHAWN WATSON,                                                           :

                    Plaintiff,

      -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                    Defendant.       :

Case No. 3:10-cv-280

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g).  The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938);  *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments;  if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. §404.1520(d).  Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment;  if not, the claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on February 17, 2004, alleging disability from March 30, 2002, due to a back impairment, asthma, angioedema, depression, and anxiety.  (Tr. 59, 86).  The Commissioner denied Plaintiff's application initially and on reconsideration.  (Tr. 45-50; 52-54).  Administrative Law Judge Melvin Padilla held a hearing, (Tr. 713-63), following which he determined that Plaintiff is not disabled.  (Tr. 12-38).  The Appeals Council denied Plaintiff's request for review, (Tr. 4-6), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff met the insured status requirements of the Act through December 31, 2008.  (Tr. 23, ¶ 1).  Judge Padilla found further that Plaintiff has severe lumbar and cervical disc disease, depression, schizoaffective

disorder versus substance-induced psychotic disorder, and polysubstance abuse/dependence, but that he does not have an impairment or combination of impairments that meets or equals the Listings. *Id.*, ¶ 3; Tr. 29, ¶ 4. Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 31, ¶ 5). Judge Padilla then used sections 202.20 through 202.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 37, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 38).

The record contains numerous medical treatment notes which pre-date Plaintiff's alleged March, 2002, onset date. In March, 1997, Plaintiff underwent an arthroscopy and partial lateral meniscectomy of his right knee. (Tr. 116-17). In July, 1997, Plaintiff sustained a fracture dislocation of the carpal, metacarpal joint of his ring and little fingers of his right hand. (Tr. 118-19). X-rays of Plaintiff's left thumb performed on June 28, 1995, revealed a fracture of the thumb. (Tr. 138). Right hand x-rays performed in February, 1996, revealed metacarpal fractures of Plaintiff's right ring and little fingers (Tr. 137). Plaintiff underwent an open reduction and internal fixation of his fourth and fifth metacarpal with implant of fixation plates on February 5, 1996. (Tr. 128, 136). In August, 1996, Plaintiff was treated for a torn meniscus of his left knee. (Tr. 130). August 26, 1997, and October 2, 1997, x-rays of Plaintiff's right hand indicated interval healing of the previously noted fractures. (Tr. 128, 127). A May 2, 1998, MRI of Plaintiff's right knee revealed no meniscal tears, (Tr. 126), and an August 19, 1998, MRI of Plaintiff's left knee demonstrated subchondral cysts within the lateral femoral condyle. (Tr. 125). On September 10, 1998, an EMG was abnormal revealing relative prolongation of the soleus-H reflex on the left side.

(Tr. 124).  A September 12, 1998, lumbar spine MRI indicated a left sided disc herniation at the L5-S1 level and annular disc bulge with a small central disc protrusion also suspected at the L4-5 interspace.  (Tr. 123).  An MRI of Plaintiff's lumbar spined performed on August 5, 1999, revealed post-surgical changes at the L5-S1 level with epidural fibrosis that surrounded the epidural soft tissue, a small central protruding disc at L4-5, and mild disc desiccation at L4-5 and L5-S1 similar to a May, 1999, MRI.  (Tr. 122).

The record contains Plaintiff's physical therapy treatment notes dated July 30, 2002, through February 20, 2003.  (Tr. 144-83).  Those notes reveal that Plaintiff participated in therapy for treatment of post-laminectomy syndrome.  *Id.*  At the time of Plaintiff's initial evaluation, it was noted that Plaintiff had a slight foot drop on the left, decreased reflexes and sensation in his legs, decreased strength of his trunk, a guarded gait, and reduced ranges of motion of his lumbar spine.  *Id.*  In September, 2002, it was noted that Plaintiff had experienced some improvement but that he continued to have reduced ranges of motion, decreased strength, and an absent Achilles reflex.  *Id.*  Plaintiff's therapist gave him a TENS unit in October, 2002, and on January 9, 2003, Plaintiff continued to demonstrate reduced ranges of motion, an abnormal gait, hamstring tightness, and left hip and leg weakness.  *Id.*  Over time, Plaintiff's physical therapists noted that Plaintiff reported having suicidal thoughts, thoughts of harming others, and that he experienced feelings of rage at home.  *Id.*  Plaintiff's physical therapy was discontinued secondary to the no show policy and no return phone call as well as being independent with his home exercise program.  *Id.*  At the time Plaintiff's program was discontinued, the therapist noted that Plaintiff had not met his goals, he had decreased ranges of motion, decreased strength, and that he had not been able to decrease his pain.  *Id.*

An MRI of Plaintiff's cervical and lumbar spines which was performed on April 17, 2003, revealed a generally unremarkable cervical spine and a central and left central disc extrusion at the L4-5 level, annulus bulging effects L5-S1, and some lower lumbar facet arthritis.  (Tr. 184).

Plaintiff underwent a series of nine nerve block and steroid injections during the period April 22, 2002, through August 14, 2003, which Dr. Rogers performed.  (Tr. 185-229).  On October 22, 2003, Plaintiff underwent a left microscopic L4-5 laminectomy and discectomy which neurosurgeon Dr. Goodall performed.  (Tr. 235-36).

The record contains a copy of Dr. Jeffries office notes dated January 30, 2001, through November 13, 2003.  (Tr. 244-82).  Those notes reveal that Dr. Jeffries treated Plaintiff for various medical conditions including back pain, anxiety, depression, panic attacks, asthma, osteoarthritis of the knees, post-traumatic stress disorder, herniated lumbar discs, bulging cervical disc, and lumbar and cervical radiculopathy.  *Id.*  On March 27, 2004, Dr. Jeffries reported that he first saw Plaintiff on October 4, 2002, and that when he last saw him, he had very slurred speech and fell asleep in the waiting room.  (Tr. 565-67).  Dr. Jeffries also reported that Plaintiff had always spoken about his angioedema, but that he (Dr. Jeffries) had never seen it, that he had treated Plaintiff for his depression, crying, and back pain, and that he had referred Plaintiff to Pain Management.  *Id.*  Dr. Jeffries noted that since he "wasn't making much headway with this patient, he [Plaintiff] wasn't trying to reduce his medications, and the disagreement that we had, he was discharged from the practice" on October 28, 2003.  *Id.*  Dr. Jeffries also noted that he did not know Plaintiff's degree of motion, his mobility, or his walking.  *Id.*

Dr. Goodall reported on May 5, 2004, that Plaintiff had been under his care intermittently since 1998 at which time he underwent a lumbar laminectomy at L5-S1 on the left and

that he initially did well.  (Tr. 637).  Dr. Goodall also reported that Plaintiff underwent a repeat laminectomy on October 22, 2003, at the level above his first surgery, that he last saw Plaintiff on December 4, 2003, at which time he complained of lumbar spine pain and bilateral gluteal pain as well as left lower extremity pain, his reflexes were absent, he had mild decreased muscle strength, and that he had decreased ranges of motion.  *Id.*  Dr. Goodall noted that Plaintiff should avoid repetitive bending, lifting, stooping, or twisting, that he could not constantly stand, sit, or walk, that he needed to freely alternate positions, and that he should not lift more than ten pounds.  *Id.*  On November 14, 2004, Dr. Goodall reported essentially the same information.  (Tr. 632).

Examining psychologist Dr. Flexman reported on May 25, 2004, that Plaintiff had a high school education, drank quite heavily before quitting at age twenty-four or twenty-five, currently smoked marijuana, and that he used cocaine in the past.  (Tr. 283-86).  Dr. Flexman also reported that Plaintiff's posture was relaxed, he displayed no gait disturbance, he engaged in activities including fishing, boating, going to flea markets, playing pool, watching television, visiting with others, handling his own finances, and working on the computer, and that his facial expressions were anxious and his general body movements were fidgety.  *Id.*  Dr. Flexman noted that Plaintiff's speech was normal, he was evasive, irritable, and resistant during the evaluation, he displayed overt pain behavior when he was walking, his affect was expansive and embellished, and that his attitude was anxious and depressed.  *Id.*  Dr. Flexman also noted that Plaintiff's concentration was good, his judgment was fair, his obsessive thinking concerning somatic or other psychological problems was judged to be out of proportion with reality and somatization was present, and that his thought processes were circumstantial.  *Id.*  Dr. Flexman identified Plaintiff's diagnoses as pain disorder associated with both psychological factors and general medical condition,

cannabis abuse in partial remission, and depression NOS, and he assigned Plaintiff's a GAF of 53. *Id.* Dr. Flexman opined that Plaintiff's abilities to understand, remember, and carry out short, simple instructions, to make judgments for simple work-related decisions, and to maintain concentration are slightly impaired and his abilities to interact with others and to respond to work pressures in a normal work-setting were moderately impaired. *Id.*

An August 25, 2004, EMG revealed evidence of a mild left predominantly C5-C6 cervical nerve root damage. (Tr. 310). On August 30, 2004, an MRI of Plaintiff's lumbar spine revealed bulging discs at L4-5 and L5-S1 and some scarring on the left of L4-5. (Tr. 312). A cervical spine MRI performed on September 3, 2004, revealed small disc protrusions at C5-6 on the right and C6-7 on the left. (Tr. 313).

During the period September 2-16, 2004, Plaintiff underwent a series of cervical spine nerve block and steroid injections. (Tr. 314-28).

The record contains a copy of pain management physician Dr. Rogers' notes dated April 10, 2001, through April 18, 2005. (Tr. 560-64; 568-83). Those notes reveal that Dr. Rogers treated Plaintiff for post-laminectomy syndrome and that over time, Plaintiff complained of pain and depression, and that Dr. Rogers documented tenderness, extensive muscle spasms, and trigger points. *Id.* Dr. Rogers treated Plaintiff with epidural injections and pain medications. *Id.* On April 18, 2005, Dr. Rogers notified Plaintiff that his drug screen was positive for amphetamines, benzodiazepines, marijuana, and opioids, that he (Plaintiff) was not being compliant with his treatment, and that Dr. Rogers would not prescribe any more medications for him. *Id.*

On January 2, 2005, Plaintiff was taken to the emergency room after exhibiting bizarre behavior including awakening his parents by shining a flashlight into their eyes and firing

8

a gun into the floor. (Tr. 338-53). Plaintiff reported having auditory and visual hallucinations and he was transferred to the psychiatric unit for treatment. *Id.*; Tr. 354-429. Plaintiff was subsequently hospitalized January 2-13, 2005, and at the time he was admitted, it was noted that Plaintiff was taking sixteen medications and his laboratory tests were positive for benzodiazepines, opiates, and amphetamines. *Id.* Plaintiff's mental health care providers identified his diagnoses as schizophrenia, paranoia, alcohol dependence, benzodiazepine abuse, and opiod abuse. *Id.*

Plaintiff was transferred to Twin Valley Behavioral Healthcare Center on January 13, 2005, where he received mental health treatment until February 3, 2005. (Tr. 430-559). During that hospitalization, it was noted that Plaintiff displayed psychotic behavior in the setting of significant chemical dependencies, significant medication-seeking behavior consistent with his history of substance abuse, and that he was treated with medications and therapy. *Id.* At the time Plaintiff was discharged, his mental health care provider reported that Plaintiff was alert and oriented and had normal speech, that his affect was euthymic and constricted, his insight was improved, and that his diagnoses were schizophrenia, paranoid type, alcohol dependence, rule out polysubstance dependence, and nicotine dependence; he was assigned a GAF of 55. *Id.* It was also noted that if Plaintiff remained compliant with medications and attended proper follow-up, his prognosis was fair to good, but that if he was noncompliant with medications or continued to abuse prescription narcotics or illicit drugs or alcohol, his prognosis was poor. *Id.*

The record contains Plaintiff's mental health treatment notes from DayMont Behavioral Health dated January 20 through May 24, 2005. (Tr. 584-610). Those notes reveal that at the time he was first evaluated, it was noted that Plaintiff reported that he previously lied about having auditory hallucinations, his thought content was normal, he was coherent, his judgment and

insight were limited, he was oriented, his affect was flat, and his mood was depressed.  *Id.*  It was also noted that Plaintiff's diagnoses were psychotic disorder NOS, rule out schizophrenia paranoid type, and rule out cannabis abuse and he was assigned a GAF of 30.  *Id.*  Plaintiff saw psychiatrist Dr. Siddiqi and counselor Ms. Cobb for treatment.  *Id.*

On August 22, 2005, Dr. Siddiqi reported that he had treated Plaintiff from February 15 to August 22, 2005, that due to his psychosis and depression, Plaintiff was not able to perform any work-related mental activities, and that he had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration.  (Tr. 611-24).  Dr. Siddiqi also reported that Plaintiff had fair to poor abilities to make occupational adjustments, poor abilities to make performance adjustments, and good to poor abilities to make personal-social adjustments.  *Id.*

Dr. Goodall reported on September 8, 2005, that Plaintiff was able to lift and carry up to five pounds occasionally, stand for a total of two hours in an eight-hour day and for one-quarter hour without interruption, sit for six to eight hours in an eight-hour day and for one-quarter hour without interruption, and that he was not able to perform light or sedentary work.  (Tr. 625-29).

The record contains a copy of treating physician Dr. Bennett's office notes dated May 4, 2004, through February 7, 2006.  (Tr. 643-52).  Those notes reveal that Dr. Bennett treated Plaintiff for various conditions including chronic back pain, asthma, and anxiety.  *Id.*

Examining psychologist Dr. Bonds noted on September 13, 2006, that Plaintiff reported he was "hallucinating voices" and "sometimes seeing things", that he was unsure of who he really is, and was depressed and having pain.  (Tr. 679-89).  Dr. Bonds also noted that Plaintiff completed the twelfth grade, attended Sinclair Community College but did not graduate, has

received mental health treatment, was admitted to the hospital in January, 2005, on a pink slip by the police, and was then probated to Twin Valley on January 13, 2005, where he remained until February 2, 2005. *Id.* Dr. Bonds reported that Plaintiff began drinking alcohol at age fifteen, that he does not drink anymore, he began using marijuana in the ninth grade and last used it two to three months ago, and that he used cocaine for about two years after his first back surgery. *Id.* Dr. Bonds also reported that Plaintiff denied current illicit drug use, he had never received treatment for alcohol or drug use, his mood seemed depressed and his affect was broad and appropriate to thought content, and that he seemed tense and nervous. *Id.* Dr. Bonds reported further that Plaintiff was alert and oriented, did not show much insight or understanding of his mental problems, and that he was not following treatment advice or making an effort to get treatment. *Id.* Dr. Bonds identified Plaintiff's diagnoses as schizoaffective disorder, bipolar type, alcohol abuse, pain disorder associated with both psychological factors and general medical condition; he assigned him a GAF of 41. *Id.* Dr. Bonds opined that Plaintiff's abilities to relate to others and to withstand the stress and pressures associated with day-to-day work activities were severely limited, his ability to understand, remember, and follow directions was not significantly limited, and his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was mildly limited. *Id.* Dr. Bonds also opined that Plaintiff's abilities to perform work-related mental activities were slightly to moderately to markedly impaired. *Id.*

The medical advisor (MA) testified at the hearing that prior to his physical injury, Plaintiff had behavioral difficulties, was apparently using and abusing substances, and had what appeared to be an impulse control disorder. (Tr. 743-58). The MA also testified that using substances would significantly interfere with the effectiveness of medications and that while he was

hospitalized the doctors were concerned that Plaintiff's abuse of medications as well as his use of

illicit substances was what precipitated the psychotic event.  *Id.*  The MA testified further that

Plaintiff would have met both Listings 12.03 and 12.09 at the time of his hospitalization, but that

four months later, in May, 2005, his condition had improved significantly and therefore his listing-

level impairments did not last twelve months.  *Id.*

In his Statement of Errors, Plaintiff alleges that the Commissioner erred by failing

to find that he is disabled by his alleged physical impairments and by failing to find that he is

disabled by his alleged mental impairments.  (Doc. 6).  The Court will first address Plaintiff's second

Error.

In support of his second Error, Plaintiff alleges that the Commissioner erred by

failing to give Dr. Siddiqi's opinion controlling weight.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ

must adhere to certain standards."  *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406

(6th Cir. 2009).  "One such standard, known as the treating physician rule, requires the ALJ to

generally give greater deference to the opinions of treating physicians than to the opinions of non-

treating physicians because

> these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [the claimant's] medical
> impairment(s) and may bring a unique perspective to the medical
> evidence that cannot be obtained from the objective medical findings
> alone of from reports of individual examinations, such as consultative
> examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,*

20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating

source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,*582 F.3d at 406*, citing, Wilson,* 378 F.3d at 544*, citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

_____

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.  *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544.  "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

Judge Padilla declined to give Dr. Siddiqi's opinion controlling or even great weight because he determined it was not supported by his clinical findings and was inconsistent with other evidence of record.  (Tr. 33).

A review of Dr. Siddiqi's notes reveals that he primarily relied on Plaintiff's subjective complaints and allegations in determining that he is disabled by his mental impairment. Additionally, Dr. Siddiqi relied in great part on Plaintiff's hospitalization records in reaching his opinion.  But, as noted above, Plaintiff himself put into question the accuracy of the information contained in those notes when he admitted that he lied about hearing voices.

While Dr. Bonds' opinion is arguably consistent with and supportive of Dr. Siddiqi's opinion, the question is whether Dr. Siddiqi's opinion is inconsistent with other substantial evidence.

14

This Court concludes that it is.

In contrast to Dr. Siddiqi's opinion, Dr. Flexman noted that Plaintiff, who has an admitted long-standing drug use history, had normal speech, was evasive and resistant, but displayed good concentration, normal speech, an expansive affect, and fair judgment. Further, Dr. Flexman noted that Plaintiff reported that he engages in a wide range of activities including driving, preparing food, doing the dishes, cleaning, going to the mall, fishing, boating, going to flea markets, playing pool, and working on the computer. (Tr. 284). Finally, Dr. Flexman opined that Plaintiff's abilities to perform work-related activities are, at worst, moderately impaired.

Dr. Siddiqi's opinion is also inconsistent with the MA's and reviewing psychologists' opinions. (Tr. 294-309).

Under these facts, the Commissioner had an adequate basis for rejecting Dr. Siddiqi's opinion.

In support of his first Error, Plaintiff essentially argues that the Commissioner erred by rejecting Dr. Goodall's opinion.

Judge Padilla declined to give Dr. Goodall's opinion controlling, or even great, weight because he determined it was not well-supported and was inconsistent with other evidence. (Tr. 33).

As noted above, Dr. Goodall opined in May and November, 2004, that Plaintiff should avoid repetitive bending, lifting, stooping, and twisting and that he should not constantly stand, sit, or walk, he needed to be able to freely alternate positions, and that he should not lift more than ten pounds. In support of his opinion, Dr. Goodall referred to his clinical findings including absent reflexes, decreased muscle strength, and decreased ranges of motion. In September, 2005,

15

Dr. Goodall opined that Plaintiff was able to lift and carry up to five pounds occasionally, stand for a total of two hours in an eight-hour day and for one-quarter hour without interruption, sit for six to eight hours in an eight hour day and for one-quarter hour without interruption.  Dr. Goodall did not cite any specific physical findings in support of that opinion but instead referred to "physical examination and MRIs".

Dr. Goodall has been Plaintiff's treating neurosurgeon since 1998 and has performed two surgeries, both lumbar laminectomies, on Plaintiff.  A review of Dr. Goodall's clinical notes reveals that he documented decreased reflexes, decreased sensory perception, positive straight leg raising, decreased ranges of motion, decreased muscle strength, positive Spurling's test, moderate paraspinal reactivity.  (Tr.  630-42).

Consistent with Dr. Goodall's findings, Plaintiff's physical therapist noted that Plaintiff had foot drop on the left, decreased reflexes, decreased sensation, a guarded/abnormal gait, absent reflexes, decreased strength, reduced ranges of motion, and muscle weakness.  Further, treating physician Dr. Rogers reported that Plaintiff had lumbar tenderness, extensive muscle spasms, and trigger points.  In addition, the objective test results, specifically MRIs, are also consistent with Dr. Goodall's opinion.  For example, an April, 2003, MRI revealed central and left central disc extrusion at the L4-5 level, annulus bulging effects at L5-S1, and lower lumbar facet arthritis and on August 30, 2004, an MRI of Plaintiff's lumbar spine revealed bulging discs and scarring on the left of L4-5.

The only evidence which opposes treating neurosurgeon Dr. Goodall's opinion is the opinion of the reviewing physician.  (Tr. 288-92; 330-36).  Under these facts, the Commissioner erred by rejecting treating neurosurgeon Dr. Goodall's opinion as to Plaintiff's residual functional

capacity.   Accordingly, the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."   42 U.S.C. §405(g).   If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted);   *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

The fourth sentence of 42 U.S.C. Sec. 405(g) directs the entry of a final appealable judgment even though that judgment may be accompanied by a remand order.   *Sullivan v. Finkelstein,* 496 U.S. 617 (1990).   The fourth sentence does not require the district court to choose between entering final judgment and remanding;   to the contrary, it specifically provides that a district court may enter judgment "with or without remanding the cause for rehearing." *Id.*

This Court concludes that not all of the factual issues have been resolved and that the record does not adequately establish Plaintiff's entitlement to benefits. Specifically, as noted above, the Commissioner erred by rejecting long-time treating neurosurgeon Dr. Goodall's opinion as to Plaintiff's residual functional capacity.  However, Dr. Goodall's opinions as to Plaintiff's residual functional capacity are arguably not entirely inconsistent with the ability to perform substantial gainful activity.  For example, Dr. Goodall opined in October and November, 2004, that Plaintiff

17

could not  constantly stand, sit, or walk, should alternate positions, and should not lift more than ten

pounds.  Additionally, in September, 2005, Dr. Goodall opined that Plaintiff was able to lift and

carry up to five pounds occasionally, stand for a total of two hours in an eight-hour day and for one-

quarter hour without interruption, sit for six to eight hours in an eight-hour day and for one-quarter

hour without interruption.  Although Dr. Goodall also opined that Plaintiff was not able to perform

either sedentary or light work, that opinion conflicts with his conclusions as to Plaintiff's residual

functional capacity.  It is, of course, the Commissioner's function to resolve conflicts in the

evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff is not

disabled be reversed.  It is also recommended that this matter be remanded to the Commissioner for

any additional administrative proceedings necessary for making a determination as to whether

Plaintiff is disabled.

April 14, 2011.

s/ Michael R. Merz
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's

objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).